UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                         No. 1:18-cr-03658-JCH

JOSHUA LEIB,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

Police officers received a nighttime 911 call that Defendant Joshua Leib was firing gunshots in his parents' house where he resided. In an attempt to attract his attention, responding officers on the scene yelled to Defendant through his open bedroom window. He would not respond so police, without a warrant, looked inside Defendant's bedroom window and then entered the home and seized a gun in Defendant's bedroom, leading to a federal gun charge.

Defendant moved to suppress the gun evidence. *See* Def.'s Am. Mot., ECF No. 46. He contends that police illegally entered his home and seized the weapon when the scene had been secured and there was no immediate danger to any individual. Because the evidentiary record establishes that police were faced with an unstable situation, the Court holds that the exigent circumstances exception to the Fourth Amendment's warrant requirement justified the warrantless search of Defendant's bedroom and seizure of the weapon. Defendant's motion is therefore denied.

**I.**     **FACTUAL BACKGROUND**

The Court makes the following findings of fact, as supported by the record, in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure.

Defendant resided with his mother and father, Mrs. and Mr. Leib, in a northwest Albuquerque, New Mexico home. On the night of August 28, 2018, Mrs. Leib's friend called 911 and reported that Defendant was shooting a gun in the Leib home. Motion Hearing Transcript 8:2-4; 10:7-10 (Mot. Hr'g Tr.). Albuquerque Police Department dispatch got a hold of Mrs. Leib's telephone number. *Id*. 12:9-11. When the dispatcher spoke to Mrs. Leib, she confirmed that she had heard three rounds fired inside the house, said that that her son may have shot himself, and told officers that she was hiding in a bedroom. *Id.* 11:24-25 – 12:1; 12:9-13. Although the 911 call was initially a priority-two call, it was treated as a priority-one call by the time Officer Dipaolo was dispatched to the scene. *Id*. 10:14-16. A priority-one call means that life or property are in danger and officers respond quickly. *Id*. 10:17-22. Dispatch alerted officers that Defendant had an extensive violent history during police encounters. *Id*. 13:1-5; 16:12-13.

Because police were alerted that a gun was involved, the investigating officers, Officers Dipaolo and Jones, approached with their sirens and headlights off and parked their vehicles at a distance from the scene. *Id*. 12:21-25; 13:17. This strategy was consistent with their training to make their presence discreet in order to avoid being the target of gunfire or ambushed. *Id*. 13:17-24.

Officer Dipaolo initially spoke to a neighbor who said that she heard a loud bang, but was unsure if the noise was gunshot. *Id*. 29:4-5. The neighbor also told Dipaolo that she saw Defendant driving drunk earlier in the day. Transcript from Lapel Camera of Officer Gianfranco Dipaolo, 3:9 (Def.'s Ex. B-1). Officers then went to speak with Mrs. Leib, who met the officers in the driveway of her home. Lapel Camera of Officer Gianfranco Dipaolo (Def.'s Ex. B). Almost immediately Mrs. Leib told Officer Jones that she thought Defendant shot himself. Transcript from Lapel Camera of Officer Russell Jones, 1:20 (Def.'s Ex. A-1). She said that her

husband, Mr. Leib, was unconscious in a backroom of the house and that Defendant was in a front room. Mot. Hr'g Tr.. 1:22-25 – 2:1-3. Defendant was "upset all day," Mrs. Leib said, and "may be laying in there dead for all I know," even though Defendant did not vocalize any suicidal or homicidal statements. *Id.* 2:18; 2:20; Def.'s Ex. B-1, 6:5-7. As they spoke to Mrs. Leib in the driveway, officers noticed a gun case and ammunition in Defendant's parked car. Def.'s Ex. A-1, 3:10-13.

From the street side of a wall enclosing the home, officers cried out public announcements or "PAs" to Defendant through his open bedroom window. Def.'s Ex. B. They asked Defendant to respond with "a grunt, noise, anything," that he was "ok." Def.'s Ex. A-1, 4:17-20. Officers received no response. Mot. Hr'g Tr. 18:8-9. As they conversed on the scene, one officer told another, "there's no reason for us to go in there." The other officer responded, "none at all. Especially if he's 27-8," to which the other officer responded, "even though it is a type of misdemeanor." Def.'s Ex. A-1, 5:1-3. After another unsuccessful PA, officers again said "there's no urgency," and "I'm not hearing him screaming or anything[.]" *Id.* 7:7-8. Moreover, Officer Jones reported to dispatch a "[negative] threat made with or to anyone with weapon." Computer Aided Dispatch, (Govt.'s Ex. 1.). Dispatch additionally tried, unsuccessfully, to call Defendant on the landline inside the home as officers continued to attempt to draw Defendant's attention through the window. Def.'s Ex. A-1, 6:1-4; 6:18-20 – 7:1-3.

Officers then decided to enter the home, telling Mrs. Leib that they intended to see if Defendant was ok. *Id*. 8:6-7. Officers arranged for a rescue team to standby or "stage" near the house. Mot. Hr'g Tr. 23:12-22. As officers waited for the standby unit, they asked Mrs. Leib if Defendant had made suicidal comments. Def.'s Ex B-1, 10:4-5. She again said no, but also repeated that he could be "laying in there dead." *Id*. 10:18.

Roughly 20 minutes and ten PAs later, officers approached the house, which was secured by a wall and iron gate that opened onto a small, enclosed patio. Def.'s Ex. B. Officer fanned out. *Id*. Officers Jones and Torres proceeded directly to Defendant's bedroom window while Officer Dipaolo stood by a nearby door. Mot. Hr'g Tr. 30:16-19. Officer Jones moved aside the curtains of the open window and inserted his head within the bedroom. He saw Defendant on the ground passed out and making grunting noises. *Id*. 33:6-8. Officer Dipaolo asked Officer Jones if he saw any visible blood, and Officer Jones responded, "he is grunting, he is alive." *Id*. 33:9-14. From outside the window Officer Jones roused Defendant, asking him if he was okay. *Id*. 34:1-3. Defendant responded "what the fuck is going on?" *Id*. 34:15-17. At this point Officer Jones told his colleagues, "I don't see the gun, he's very [drunk]. We know he's okay, um, I mean do we need to do anything else?" Def.'s Ex. A-1, 12:16-17. Another officer responded, "no," and that "we don't have anything to arrest on him." *Id*. 12:18-19. Defendant declined all offers of medical attention. Mot. Hr'g Tr. 37:12-16.

Lapel camera video from Officer Jones shows that continued to visually search the bedroom. Def.'s Ex. A. Roughly three-minutes after Officer Jones first peered through Defendant's window, Officer Jones told his colleagues that he spotted a firearm about five-feet away from the officer's position at the window. Def.'s Ex. A-1, 14:5. At this point Officers Dipaolo and Torres entered the house without consent from Defendant or his mother while Officer Jones remained at the window. Mot. Hr'g Tr. 38:23-25 – 39:1-8. When officers opened Defendant's bedroom door, Defendant appeared face down on a mattress. *Id*. 41:10:12; 47:25 – 48:1. Officer Dipaolo immediately seized the gun, which was on the floor near the mattress. *Id*. 39:14-16; 40:16-17. Defendant told officers to "get away" and answered "no" when they asked him if he felt like hurting himself or anyone else. Def.'s Ex. B-1, 19:17, 20:5-8. After concluding

4

that Defendant was "very drunk" but not in need of medical attention, officers left the bedroom. *Id.* 20:20; Def.'s Ex. B. They spoke briefly to Mrs. Leib and then left the scene about four minutes after entering Defendant's bedroom. *Id*. Officers made no further intrusions into the house. Mot. Hr'g Tr. 25:10-12. According to Officer Dipaolo's lapel camera, the entire event – from when they first spoke to a neighbor until officers left the scene - lasted about 35 minutes. Def.'s Ex. B.

## II. PROCEDURAL BACKGROUND

After APD officers took the firearm for safekeeping, officers queried into Defendant's criminal background. *See* Criminal Compl. ECF No. 1, ¶ 24. Defendant has four felony convictions for aggravated assault with intent to commit a violent felony on a police officer, driving while intoxicated, aggravated assault against a household member with a deadly weapon, and aggravated battery. *Id.* at ¶¶ 24, 31. After determining that Defendant had felony convictions, a federal law enforcement officer reviewing the case filed a federal criminal complaint against Defendant in October 2018. On September 11, 2019, a federal grand jury indicted Defendant for one-count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. *See* Superseding Indictment, ECF No. 69.

## III. FOURTH AMENDMENT OVERVIEW

In his motion to suppress, Defendant argues that officers were not reasonably faced with an emergency when they responded to the scene. If an emergency situation did exist, Defendant contends that it surely dissipated after officers confirmed that Defendant committed no apparent criminal offense, the scene had been secured, Defendant refused medical aid, and there was no immediate danger to any individual. He therefore argues that the warrantless search that revealed the gun violated the Fourth Amendment.

5

The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980) (internal quotation marks omitted). Generally speaking, warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona,* 437 U.S. 385, 390 (1978).

"[E]xceptions to the warrant requirement are few in number and carefully delineated, and ... the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 749–50 (1984) (internal quotation marks and citation omitted). One such well-delineated exception is the existence of exigent circumstances. "Warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler,* 436 U.S. 499, 509 (1978). "Officers do not need probable cause if they face exigent circumstances in an emergency." *Armijo ex rel. Armijo Sanchez v. Peterson,* 601 F.3d 1065, 1075 (10th Cir.2010). Recognized exigencies include situations in which the occupant of a residence is injured or is in danger of imminent injury. *See Michigan v. Fisher,* 558 U.S. 45, 47-48 (2009); *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403-04 (2006); *see e.g. United States v. Shively*, 9 F. App'x 884, 885 (10th Cir. 2001) (danger of suicide); or when there is a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at the police. *See e.g. United States v. Gay,* 240 F.3d 1222, 1228-29 (10th Cir. 2001).

"In determining whether the risk of personal danger creates exigent circumstances, [the court uses] a two-part test: whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) (citation and quotation marks omitted). In conducting the analysis, the court looks "from the viewpoint of prudent, cautious, and trained officers." *Id.* The government bears the burden of proving the exigency exception to the warrant requirement applies. *See United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard." *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015) (citation omitted). The government's burden is "especially heavy when the exception must justify the warrantless entry of a home." *Najar,* 451 F.3d at 717. "When a search violates the Fourth Amendment, the exclusionary rule normally dictates that evidence obtained as a result of that search be suppressed." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

## IV. DISCUSSION[1]

A. Exigent Circumstances Analysis

The first-prong of the exigent circumstances test looks at whether the officers had an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others. *See Najar*, 451 F.3d at 718-19. Before turning to the merits of Defendant's

---

[1] Defendant devoted a portion of his motion to arguing that (1) he had a legitimate expectation of privacy in his bedroom and (2) he did not consent to the search of his room. *See generally* Def.'s Am. Mot. at 8-12. The Court does not need to address these arguments because the Government conceded in its response brief that Defendant has standing to challenge the search and expressly forfeited any argument that Mrs. Leib consented to the search. *See* Govt.'s Resp. Br, ECF No. 50, 1. The Government likewise made no argument or adduced any evidence that Defendant consented to the search. Accordingly, the Court's analysis is limited to the exigent circumstances issue.

motion, it makes sense to discuss some key cases concerning the exigency exception to the Fourth Amendment's warrant requirement. In *Brigham City* police officers witnessed through the windows of a house a physical fight involving several people in which one man spat blood into a sink after being punched in the face while others attempted to restrain the man responsible for the punch. 547 U.S. at 406. Emphasizing the need for an immediate response, the Supreme Court explained that "[n]othing in the Fourth Amendment required [the police officers] to wait until another blow rendered someone 'unconscious' or 'semi-unconscious' or worse before entering," and that held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. at 403, 406.

Relying on *Brigham City*, the Tenth Circuit has upheld warrantless entries based on exigent circumstances in cases similar to the one here. In *Najar*, a 911 call to New Mexico police was disconnected and when dispatch tried calling back the home the dispatcher was met with hang-ups. 451 F.3d at 715-16. Responding officers knocked at the home. *Id.* at 716. After initially ignoring police, the defendant finally came to the door but denied calling 911 and said he was the only person in the home. *Id.* at 716-17. Relying in part on *Brigham City*, the Tenth Circuit held that, "[g]iven the totality of the circumstances, the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required," given the number of suspicious hang-ups. *Id.* at 720.

In *United States v. Gambino-Zavala*, 539 F.3d 1221, 1224 (10th Cir. 2008), Albuquerque police responded to multiple 911 calls reporting gunfire at an apartment complex. Officers spoke to a "frantic and scared" tenant who resided in the apartment directly below the unit where gunfire was believed to come from. *Id*. After several minutes of knocking and announcing, the

defendant opened his door but told responding officers that nobody else was in the apartment. *Id*. Without a warrant, officers went in the apartment and conducted a two-minute sweep to search for injured persons. *Id*. The Tenth Circuit upheld the search because the information from "credible witnesses" indicated that "the officers had objectively reasonable bases to believe there was an immediate need to search the apartment to protect the safety of others," given that eight gunshots were reported. *Id*. at 1226.

With this legal framework in mind, the Court concludes that it was objectively reasonable to believe that the danger to Defendant's well-being and that of his father's was ongoing and that it was necessary to enter. Significantly, the officers arrived in response to a priority-one 911 call that Defendant was "shooting up" his parents' house. "911 calls are the predominant means of communicating emergency situations." *Najar*, 451 F.3d at 719. The information about Defendant firing his gun was independently corroborated by his mother. She told police over the telephone that Defendant fired rounds and "may have shot himself." She told officers that she would await their arrival in her bedroom, presumably because she was in fear. While en route, dispatch reported to officers that Defendant had a violent history during encounters with law enforcement. *Cf. United States v. Davis*, 290 F.3d 1239, 1243 (10th Cir. 2002) (defendant's lack of a reputation for violence weighed against exigency).

When they arrived, police learned from neighbors that Defendant was seen driving drunk and they observed a gun case and ammunition in Defendant's car. Mrs. Leib again told police that Defendant "may have shot himself," that her unconscious husband remained in the house, and repeatedly told officers that her son had been very "upset." Defendant then did not answer multiple police calls to the window or dispatch's telephone call to Defendant on the landline. Officers summoned rescue personnel and Officer Dipaolo donned latex gloves because he

expected to encounter blood, indicating that officers perceived a potentially emergency situation. On these facts, officers had objectively reasonable grounds on which to believe that Defendant might harm himself or someone else. *See West v. Keef,* 479 F.3d 757, 759 (10th Cir.2007) (12-year old's 911 call that his mother was "going crazy" and "trying to kill herself" were statements that "standing alone and in context, sufficient to justify the warrantless entry."); *United States v. Stotts*, 346 F. App'x 356, 359 (10th Cir. 2009) (exigent circumstances justified warrantless search of defendant's residence where 911 caller reported that defendant "was drunk, armed, a felon, and had threatened an individual in the home," and defendant's stepson told responding officers that he was "scared."); *see also Najar*, 451 F.3d at 719; *cf. Cortez v. McCauley*, 478 F.3d 1108, 1124 (10th Cir. 2007) (exigent circumstances did not justify officers' warrantless search and seizure of suspects where they were asleep when officers arrived, cooperated with police commands, there was no threat of actual or threatened injury to any person or imminent violence, and police acted on an unsubstantiated tip). It was objectively reasonable for police on the scene to believe that the danger to Defendant's well-being and possibly that of his father's was ongoing and that, in the absence of Defendant's cooperation, they needed to enter the home quickly.

Defendant argues that any emergency is belied by officers' conversation before entering the house that there was "no urgency," and "no reason for [police] to go in there." However, when asked to contextualize some of these statements at the suppression hearing, Officer Dipaolo testified that there was no "driving force" that would have compelled him to immediately enter, such as the sound of screaming, active gunfire, or a visible trail of blood, and that the information officers had about Defendant did not give rise to any arrestable charges. *See* Mot. Hr'g Tr. 20:15-24; 21:9-14. He believed there was a very real possibility Defendant had shot himself, and explained that officers wanted to get as much information as possible about the

unfolding scene, establish contact with the Defendant, and gauge the police response to the situation. In *Najar*, 451 F.3d at 719, the Tenth Circuit approved similar police precautions and explained that police officers' 30-minute delay between arrival and making a warrantless entry did not "obviate the existence of an emergency," when the delay was due to officers' "reasonable investigation into the situation facing the officers." *Id*. The same is true here. For similar reasons, the Court is unpersuaded by Defendant's argument that officers' conduct did not indicate an emergency because they "did not use lights or sirens … [they] approached the residence slowly on foot … [and] when APD officers finally engaged with Mrs. Leib, their engagement did not reflect any concern that a person was in immediate need of medical attention or that there was any threat to their or others' safety." Def.'s Am. Mot. at 4. As Officer Dipaolo testified, these actions were consistent with their training to make their presence discreet when responding to a report involving a firearm. The emergency situation is no way diminished because officers responded in a manner consistent with their training.

Defendant additionally argues that any emergency situation dissipated once the officer observed Defendant through the window and saw that he was alive, coherent, and did not want medical assistance. Defendant believes that officers should have left the scene, but instead "barreled forward with their illegal search of [Defendant's] bedroom." Def.'s Am. Mot. at 17. However, this is simply asking the Court to second-guess officers' actions in the face of a developing situation. The gun was unaccounted for. And despite Defendant's self-assessment that he was "ok," he was apparently heavily intoxicated and just minutes beforehand provided no responsive answer to officers' repeated calls to him over a period of about 20 minutes. How were the officers to know that Defendant was competent to assess his own condition or that he no longer posed any risk of harm to himself or someone else in the house? In other words,

Defendant was not a credible source of information regarding the risks present on the scene. Given that police were acting in a developing situation, it was reasonable for officers to enter and remove the gun from the scene, even if they had already confirmed that Defendant was intoxicated. *See Gordon*, 741 F.3d at 71 (nothing that officers can temporarily seize a gun where the seizure is connected to the safety of persons on the scene).

The second-prong of the *Najar* test requires that the manner and scope of the search was reasonable. *See Najar*, 451 F.3d at 718-19. Here, the degree of intrusion was reasonably related to the facts known to the officers while they were in the house. They proceeded directly to Defendant's bedroom, seized the gun, and asked him if he needed assistance. Once officers determined that Defendant was not in need of immediate aid, no further intrusion into the house occurred and the officers left the scene shortly after, demonstrating that the entry did not last any longer than reasonably necessary. *See Gambino-Zavala*, 539 F.3d at 1226 (noting that a search is reasonable if officers "confined the search to only those places inside the home where an emergency would reasonably be associated.") (citation omitted).

In summary, it was reasonable to believe there was an immediate need to investigate concerns for the life or safety of another and therefore the entry and search of Defendant's bedroom and seizure of his alleged firearm was lawful.

B. Caselaw Cited by Defendant

Defendant cites this Court's case, *United States v. Christy*, 810 F. Supp. 2d 1219 (D.N.M. 2011), for the proposition that threats of suicide must be "pronounced and immediate" to justify a warrantless entry, and that in this case the officers were faced with no such danger. In *Christy*, law enforcement officers learned from a 16-year old runaway girl's parents that the girl was depressed, had attempted suicide in the past, and was off her medications. *Id.* at 1227, 1267.

Believing that the child was actively suicidal and in the defendant's residence, officers forcibly entered the defendant's residence to look for her, leading to the discovery of incriminating evidence. *Id.* at 1241. The Court held that exigent circumstances did not justify the warrantless entry because the child's suicide attempt occurred seven-months earlier. *Id.* at 1268. Thus, the bare facts showed that the girl was depressed, had previously attempted suicide seven-months ago, and was off her medications – none of which showed a "pronounced and immediate risk" of suicide to justify the warrantless entry. *Id.*

In reaching that conclusion, the Court analyzed three cases justifying warrantless entry because officers were confronted with a more "pronounced and immediate risk of suicide than … here." *Id.* In *United States v. Shively,* 9 Fed. Appx. 884, 885 (10th Cir. 2001), police received a report that the defendant ingested a large quantity of drugs in an attempt to kill himself. In *Cloaninger ex rel. Estate of Cloaninger v. McDevitt,* 555 F.3d 324, 328 (4th Cir. 2009), one officer knew that the individual had made suicide threats in previous interactions with police. And in *Ziegler v. Aukerman,* 512 F.3d 777, 985 (6th Cir. 2008), officers forcibly removed the individual from her home because a hospital classified her as suicidal and demanded her immediate return. Defendant cites these cases in support of his argument that the circumstances here did not suggest that he was suicidal.

The Court holds that the evidentiary record, properly examined from the viewpoint of prudent, cautious, and trained officers, shows that police reasonably believed that they were presented with a danger of suicide. They responded to Mrs. Leib's contemporaneous report to dispatch that her live-in son fired three rounds inside the house, may have shot himself, and that she would hide in a bedroom. Some of Mrs. Leib's first words to arriving officers were that Defendant could be dead. Officers could not discount these alarming on-the-scene statements

just because Defendant had no known history of attempted suicide. Any alarms were reinforced when officers' repeated cries to a man with a gun who had been drinking were met with silence. The facts presented in the record satisfy the legal test of exigency.

**IT IS THEREFORE ORDERED that** Defendant Joshua Leib's Amended Motion to Suppress Evidence Seized as a Result of the Unlawful Search of Mr. Leib's Bedroom **[ECF No. 46]** is **DENIED**.

**IT IS SO ORDERED**.

_____
JUDITH C. HERRERA
SENOR U.S. DISTRICT JUDGE